VENETIA K. CARPENTER-ASUI    6901
Haseko Center
820 Mililani Street, Suite 812
Honolulu, Hawaii 96813
Telephone:  (808) 523-6446
Facsimile:  (808) 523-6727

Attorney for Plaintiff
REZA J. LESANE

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 06 2008

at 3 o'clock and 55 min. P M. J
SUE BEITIA, CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| REZA J. LESANE; | ) | Civ. No. CV08 00120 JMS KSC |
| | ) | |
| Plaintiff, | ) | COMPLAINT; DEMAND |
| | ) | JURY TRIAL; SUMMONS |
| vs. | ) | |
| | ) | |
| SWISSPORT USA, INC; | ) | |
| JOHN DOES 1-20; DOE ENTITIES | ) | |
| 1-10; | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

REZA J. LESANE ("Plaintiff"), by and through his attorney,
complaining of SWISSPORT USA, INC. ("Defendant") alleges and states:

### I.    JURISDICTION & VENUE

1.    There is federal jurisdiction of the claims against Defendant
pursuant to 28 U.S.C. ss 1331 and 1337.

2.    Venue is proper in this District as both the Plaintiff and each of
the Defendants reside and conducts business in this District and the events

and omissions giving rise to the Plaintiff's claims arose in this District.

## II.   PARTIES

3.      Plaintiff at all times relevant herein was a resident of the City and County of Honolulu, State of Hawaii and an employee of Defendant.

4.      Defendant at all times relevant herein was a business corporation that conducted business in the City and County of Honolulu, State of Hawaii and was Plaintiff's employer.

5.      Defendants JOHN DOES 1-20, DOE ENTITIES 1-10, are sued herein under fictitious names for the reason that their true names and identities are presently unknown to Plaintiff, except that they are persons and/or entities who are in some manner presently unknown to Plaintiff and engaged in the activities alleged herein; and/or persons who conducted some activity in a negligent and/or willful manner; which conduct was the legal cause of the injuries or damages to Plaintiff and/or were in some manner related to the previously named Defendant engaged in the activities alleged herein; and Plaintiff prays leave to insert their true names and capacities, activities and/or responsibilities, whether individual, business or governmental when the same is ascertained.  Plaintiff has been unable to ascertain the identities of these DOE Defendants through an examination of all documents available to him at this time.

6.      All Defendants will be collectively referred to as "Defendants."

## III.   FACTS

7.      Plaintiff is an African-American person.

8.      Plaintiff was hired by Defendant as an aircraft maintenance supervisor on May 30, 2005.

9.      On June 5, 2005 Defendant offered Plaintiff a promotion to the

aircraft maintenance manager's job, which Plaintiff accepted.

      10.    Prior to being hired by Defendant on May 30, 2005, Plaintiff had thirty-eight (38) years of experience in the aviation industry, which included: Hawaiian Airlines Inc., Aloha Airlines, Embry-Riddle Aeronautical University, and the U.S. Army.

      11.    Plaintiff's duties and responsibilities as an aircraft maintenance manager included, but were not limited to: administration of aircraft maintenance staff and activities; supervision, development, and performance of aircraft maintenance staff; customers' requirements and services; responsible for the work of the repair station and maintenance staff performance; appointed as accountable manager and serves as a primary contact with the FAA; participates and provides input for aircraft maintenance budget; monitors, controls, and maintains budgeted items; meets budget and justifies variances as applicable; monitors and controls payroll hours in accordance with budgeted hours; participates in the preparation of aircraft maintenance proforma; knowledgeable and familiar with each customer's contractual requirements; prepares customers' billing (service charges) as required and applicable; maintains RSM, its supplement (RSMS), and QCM current at all times; forwards any request for revision to VPAM; ensures full compliance with the RSM, QCM, and RSTM; performs other duties as pertains to station's activity.

      12.    Plaintiff's educational experience includes: a masters degree in Aeronautical Science: Aviation/Aerospace Management and Aviation/ Aerospace Safety Systems in July 2006 from Embry-Riddle Aeronautical University; a Bachelor of Science degree in June 2004 from Embry-Riddle Aeronautical University.

13. In a letter from Defendant dated February 22, 2006 Plaintiff was notified that he successfully completed Defendant's contractor Northwest Airlines requirements for: a) DLRA for DC-10 aircraft; and b) NWA station management approval for RII training.

14. In a letter from Defendant's Station Manager Carol Bledsoe, Plaintiff was acknowledged for his perfect attendance in the year 2005.

15. In August 2006 Plaintiff was preparing Defendant's contractor Northwest Airlines account annual budget and observed that the other Aircraft Maintenance Manager Reginald "Pete" Schneider (Caucasian) who worked under Defendant's Japan Airlines contract was being paid $33.00 per hour, while Plaintiff was being paid $27.00 per hour. This disparity in pay had no basis, as the two men have approximately the same amount of work experience in the aviation industry, and Plaintiff had a bachelors degree in professional aeronautics at that time.

16. In early September 2006 Plaintiff sent an e-mail to Defendant's Director of Aircraft Maintenance Jim Smith (Caucasian) based in Seattle Washington, and informed him of the disparate pay, and asked to speak with him about it.

17. On September 15, 2006 Defendant's Director of Aircraft Maintenance Jim Smith e-mailed Plaintiff back and falsely accused Plaintiff of "complaining".

18. On September 15, 2006 Plaintiff e-mailed Defendant's Director of Aircraft Maintenance Jim Smith back and informed him that Plaintiff was not "complaining" and that Plaintiff had a legitimate concern regarding pay disparity.

19. On August 23, 2006 at 1:16 p.m., August 24, 2006 at 9:24 a.m.,

4

and September 7, 2006 at 3:18 p.m., Plaintiff telephoned Defendant's Director of Aircraft Maintenance Jim Smith and left messages for him to call Plaintiff back about the disparate pay issue. Defendant's Director of Aircraft Maintenance Jim Smith did not return Plaintiff's telephone calls.

20.    On Monday, September 25, 2006 Plaintiff e-mailed Defendant's Vice President Hasnain Ansari (Pakistani) based in Los Angeles, and asked to discuss the disparate pay with Plaintiff because Defendant's Director of Aircraft Maintenance Jim Smith viewed his report as "complaining":

> Mr. Ansari,
> I have some very important concerns that I would like to discuss with you. I have tried contacting Jim Smith but have always gotten his voice mail and he have (sic) not made any attempt to contact me except email telling me to call him. Mr. Smith have (sic) expressed to me that my concerns are complaining.
>
> I have notice (sic) that my responsibility (sic) are the same as the 145 manager here. However, my salary is not or near the same as that manager.
>
> My other concerns (sic) is support. As you stated on (sic) our conference call 9/22/2006, employee concerns must be addressed, because their concerns take their mind off the job at hand. I would welcome the opportunity to discuss my concerns with you at your early (sic) convenience.

21.    On Wednesday, September 27, 2007 Defendant's Vice President Hasnain Ansari e-mailed Plaintiff back and instructed Plaintiff to follow the chain of command, and referred Plaintiff back to Defendant's Director of Aircraft Maintenance Jim Smith, who ignored Plaintiff's previous telephone messages to him.

22.    On November 17, 2006 Plaintiff met with Defendant's attorney

Matt Wakefield (Caucasian) in Honolulu, Hawaii and informed him of Plaintiff's disparate pay complaint. Plaintiff also informed him that Plaintiff intended to talk to an attorney about it.

23.    On November 30, 2006 Defendant's Vice President Hasnain Ansari e-mailed Director of Aircraft Maintenance Jim Smith, Aircraft Maintenance Manager Reginald "Pete" Schneider, and Plaintiff, and requested a telephone conference. Plaintiff telephoned Defendant's Vice President Hasnain Ansari right away and the first thing he said to Plaintiff was, "what's this I hear your bringing in outside help for your problem?" Plaintiff replied that Plaintiff told Defendant's attorney Matt Wakefield that Plaintiff intended to talk to an attorney because Vice President Hasnain Ansari referred Plaintiff back to Director of Aircraft Maintenance Jim Smith, who ignored Plaintiff's earlier telephone messages to Plaintiff, and that Plaintiff was not getting any results from Director of Aircraft Maintenance Jim Smith because he viewed Plaintiff's disparate pay issue as "complaining". Defendant's Vice President Hasnain Ansari said to Plaintiff, "we don't need any outside help, we can solve our problem ourselves."

24.    On October 6, 2006 Plaintiff had mailed the Hawaii Civil Rights Commission (HCRC) an HCRC Pre-Complaint Questionnaire alleging race discrimination based on unequal pay and unequal hours. However, on or about December 3, 2006, based on Defendant's Vice President Hasnain Ansari's representations to Plaintiff, "we don't need any outside help, we can solve our problem ourselves", Plaintiff telephoned the HCRC and informed Investigator Erin Nakamura that Plaintiff wanted to cancel his HCRC complaint.

25.    On December 28, 2006 Plaintiff e-mailed Defendant's Director

of Aircraft Maintenance Jim Smith and advised him that Plaintiff may not be able to attend the annual aircraft maintenance manager meeting in Las Vegas from January 14-18, 2007 because Plaintiff's wife was due to give birth at that time. Plaintiff also faxed him jury duty forms that Plaintiff received for the same time period.

26. On December 20, 2007 Plaintiff sent an e-mail to Defendant's Director of Aircraft Maintenance Jim Smith and once again asked to discuss Plaintiff's disparate pay issue with him.

27. On December 21, 2007 Defendant's Director of Aircraft Maintenance Jim Smith e-mailed Plaintiff back and suggested they meet in person during the annual aircraft maintenance manager meeting in Las Vegas from January 14-18, 2007.

28. On January 5, 2007 Plaintiff e-mailed Defendant's Director of Aircraft Maintenance Jim Smith, and once again informed him that Plaintiff was not going to the annual aircraft maintenance manager meeting in Las Vegas because his wife was due to give birth. Plaintiff received no response regarding his disparate pay issue from the Director of Aircraft Maintenance Jim Smith.

29. On January 24, 2007 Plaintiff filed a ***second*** HCRC Pre-Complaint Questionnaire alleging race and color discrimination based on harassment. Plaintiff signed a charge of discrimination form on May 15, 2007.

30. On January 29, 2007 Plaintiff sent an e-mail to Defendant's Vice President of Human Resources William Rodriguez and asked for an explanation as to his disparate pay issue:

Mr. Rodriguez,

7

I was hired by Carol Bledsoe on May 30, 2005 at $53,000.00 per year. The aircraft maintenance manager she hired in December 2004 was hired at a much higher rate of pay. Why is the salary so different between us? We both are over 55 years old, we both have about the same amount of experiences in aircraft maintenance.

According to our Repair Station Manual our job title are the same and our responsibility and duties are the same, except that I am required to physically go out and work on NWA aircrafts. Therefore, I am working under my Airframe and Powerplant license, which means if I do anything wrong my license and livelihood is in jeopardy, where the other manager is working under the Repair Station Certificate.

Looking forward to hearing from you and thank you in advance for your assistance.

Plaintiff once again received no response.

31.    In a letter dated March 13, 2007 Defendant's Executive Vice President Erich Bodenmann recognized Plaintiff's work, "I'm proud of what you have done personally for Swissport and I consider it appropriate to express my appreciation through the presentation of this performance incentive [$4,155.61]. This incentive acknowledges your contribution to the organization, the role you play in shaping our image and the dedication you have shown in the performance of your numerous job responsibilities; all things of which you should be proud."

31.    In addition, Plaintiff was also subjected to disparate treatment when Plaintiff was the only managerial level employee denied the use of a company vehicle during the course of his employment. Other Hawaii based managers including: Defendant's Aircraft Maintenance Manager Reginald "Pete" Schneider (Caucasian), Honolulu Station Manager Carol Bledsoe

(Caucasian), Manager of Ramp Services Sam Goodman (Caucasian), Manager Ground Services Support Frank Silva (Portuguese) and Manager of Cargo Services Quinn Nguyen (Vietnamese) all had use of company vehicles, while Plaintiff did not.

32.    In addition, Plaintiff was also subjected to disparate treatment when in late 2006 Defendant's Aircraft Maintenance Manager Reginald "Pete" Schneider was permitted to attend training in Washington D.C. on preparation of budgets, while Plaintiff was not.

33.    In addition, Plaintiff was also subjected to disparate treatment when during the course of Plaintiff's employment, Plaintiff worked more hours than Defendant's Aircraft Maintenance Manager Reginald "Pete" Schneider worked, yet Plaintiff received less pay than he did.

34.    In response to Plaintiff's complaints of disparate treatment, Defendant claimed to have hired an "independent" consultant Geoffrey Johnson who, despite the above, found that "no unlawful conduct occurred" according to a letter dated August 15, 2007.

35.    After engaging in protected activity by reporting disparate treatment based on race to Defendant and to the HCRC, Defendant retaliated against Plaintiff, including, but not limited to:

   a. 7/06 - 8/21/07 Defendant continued to deny Plaintiff the use of a company vehicle while allowing the other non-African American managers the use of a company vehicle.

   b. 11/15/06 Vice President Hasnain Ansari wrongly blamed Plaintiff for a Petition to Unionize filed with the NLRB by employees, despite the fact that Plaintiff notified him

9

in writing on 8/10/06 that mechanics were earning less than $20.00 per hour and not happy about it, and Defendant ignored the employees low wage complaints. The triggering event of the disharmony was the 4/06 pay raises awarded to the Japan Airlines contract mechanics, with nothing for the Northwest Airlines contract mechanics.

c.   8/7/07 4:17 p.m. Director of Aircraft Maintenance Jim Smith telephoned Plaintiff and informed Plaintiff that management was blaming Plaintiff for employees leaving employment to work for higher wages at other airlines, despite the fact that Plaintiff had no control over their wages. (i.e.: Supervisor Jessie Parker left for higher wages at Continental Airlines; Supervisor Raphael Libut left for higher wages at Boeing Aircraft; Supervisor Brian Asari left for higher wages at Aloha Airlines; Mechanic Aaron Rodante left for higher wages at Continental Airlines; Mechanic Aliksa Duffy left for higher wages at Boeing Aircraft; Mechanic Christopher Lemelle left for higher wages at Boeing Aircraft; Mechanic Alessandro Pacheco left for higher wages at Aloha Airlines; Mechanic Wayne Aka moved to Vietnam.).

d.   8/21/07 Director of Aircraft Maintenance Jim Smith informed Plaintiff in writing that his position was "eliminated as part of a management and supervisory

10

restructure at your station". On 8/21/07 Defendant posted a notice to all aircraft maintenance personnel which stated in part:

> It has been determined that a management and supervisory restructure within the Aircraft Maintenance Department is necessary to meet NWA standards and to ensure the continued viability of the Honolulu NWA account.
>
> Effective immediately, the SP/NWA Aircraft Maintenance Manager position has been eliminated. I would like to thank Ray Lesane for his service and wish him well in his future endeavors.
>
> We are working with NWA on the new management and supervisory structure. Until a final department restructuring has been put into place, there will be a periodic management rotation within the department. Lito Kunz will be in place initially to support and assist the overall daily management needs of the operation.
> Mr. Kunz will temporarily be responsible for the day to day maintenance operations of the aircraft maintenance department and will report to the Regional Director of maintenance.
> Please provide Mr. Kunz your full support during this transition period.

36.     On August 16, 2007 Plaintiff filed a ***third*** HCRC Pre-Complaint Questionnaire alleging race, color, age and retaliation discrimination.

37.     On August 24, 2007 Plaintiff filed a ***fourth*** HCRC Pre-Complaint Questionnaire alleging race, color, age and retaliation

11

discrimination.

38.     Plaintiff engaged in protected activity when he complained verbally and in writing of disparate treatment.  Defendant subjected Plaintiff to adverse employment actions after it learned that Plaintiff engaged in protected activity.  Defendant's explanation for terminating Plaintiff's employment because, his position was "eliminated as part of a management and supervisory restructure at your station" was a pretext for unlawful retaliation because:

a)      if Plaintiff's position was "eliminated" as stated in the termination letter, why was Aircraft Maintenance Manager Lito Kunz immediately flown in to replace Plaintiff from Washington D.C.?;

b)      if Plaintiff's position was "eliminated" as stated in the termination letter, why wasn't Plaintiff offered one of the three open Supervisor positions that had become vacant when the three supervisors listed above quit for higher paying jobs?;

c)      how could Plaintiff's position be "eliminated" when Defendant's bid to Northwest Airlines stated under Staff Requirement: Headcount that it would provide one (1) " Manager"; and

d)      How could my position be "eliminated" when Defendant's contract with Northwest Airlines required:

8.5     Management of Seller Personnel
Seller shall provide working managers or supervisors at each worksite who shall be responsible for supervising and directing the day-to-day activities of Seller's

personnel and for ensuring Seller's performance of this
Agreement at such worksite.  Such working managers or
supervisors shall be expected to provide direct
maintenance services in addition to supervision and
directing Seller's employees.  Seller shall provide day-
to-day supervisory control or direction over Seller's
employees.

39.   Defendant breached an implied contract with Plaintiff when it
violated its own written Swissport Ethics Standards of Business Ethics and
Conduct page 14 which states:

### DISCRIMINATION, EQUAL EMPLOYMENT, AND HARASSMENT

Swissport is an Equal Opportunity Employer as a matter
of law, ethics and good business practice.  No employee
is to discriminate against another employee or
prospective employee or make disparaging comments or
criticisms on the basis of race, color, creed, religion, sex,
national origin, ancestry, age, handicap, veteran's status,
or gender identity nor will any illegal harassment
including sexual harassment be tolerated.  Such practices
must be avoided in daily work as well as in personnel
actions - hiring, transfer, promotion, pay action and
terminations.

The Company is particularly concerned that all of its
employees receive fair and nondiscriminatory treatment
regardless of their gender.  The Company has a firm
policy against any harassment or intimidation based on
or related to an employee's gender.  Harassment on an
illegal basis has no place in the Swissport business e
environment, and violations of the Company's illegal
workplace harassment policy will be subject to
immediate disciplinary action as in the case of other
discriminatory actions.

13

Defendant breached its policy when it paid Plaintiff less money than a similarly situated Caucasian male co-worker and then retaliated against Plaintiff for complaining of disparate treatment.

40.     Plaintiff received two right to sue letters from the Hawaii Civil Rights Commission dated January 7, 2008 for EEOC No. 37B-2007-00491, FEP No. 14362, and EEOC No. 37B-2007-00195, FEP No. 14025, and filed a timely lawsuit on March 6, 2008.

## COUNT I

(Title VII Civil Rights Act of 1964 as amended 42 USC 2000e et. seq. - race discrimination)

41.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 40 above as though fully set forth herein.

42.     Defendant discriminated against Plaintiff in violation of Title VII Civil Rights Act of 1964 as amended 42 USC 2000e et. seq. - race discrimination.  Plaintiff belongs to a protected category (African-American persons); he was performing his job to Defendant's expectations; he suffered an adverse employment action (less pay); and others not in his protected category were not subjected to the adverse action.

43.     As a result of Defendant's actions and/or inactions, Plaintiff suffered and is continuing to suffer damages that he will prove at trial.

## COUNT II

(Title VII Civil Rights Act of 1964 as amended 42 USC 2000e et. seq. - retaliation)

44.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 43 above as though fully set forth herein.

45.     Plaintiff engaged in protected activity when he reported pay

disparity based on race; Plaintiff suffered an adverse employment action (see above); and the adverse employment action was because of Plaintiff's protected activity.

46.     As a result of Defendant's actions and/or omissions, Plaintiff has suffered and is continuing to suffer damages that he will prove at trial.

## COUNT III

### (Intentional Infliction of Emotional Distress)

47.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 46 above as though fully set forth herein.

48.     The above statements, acts and/or conduct of Defendant, individually and collectively, constitute intentional infliction of emotional distress, extreme and outrageous behavior which exceeds all bounds usually tolerated by a decent society, all done with malice and the intent to cause, or the knowledge that it would cause, severe mental and/or emotional distress to Plaintiff.

49.     As a result of Defendant's actions and/or omissions, Plaintiff has suffered and is continuing to suffer damages that he will prove at trial.

## COUNT IV

### (Breach of Implied Contract)

50.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 to 49 above as though fully set forth herein.

51.     Defendant promulgated employee rules that provide for specific treatment in specific situations; Plaintiff was induced thereby to remain on the job; and Plaintiff did not actively seek other employment.

52.     As a result of Defendant's actions and/or omissions, Plaintiff has suffered and is continuing to suffer damages that he will prove at trial.

WHEREFORE, Plaintiff prays as follows:

a.      that Plaintiff be awarded compensatory damages, assessed jointly and severally against all Defendants, in an amount to be determined at trial herein.

b.      that Plaintiff be awarded special damages, assessed jointly and severally against all Defendants, in an amount to be determined at trial;

c.      that Plaintiff be awarded exemplary or punitive damages in an amount to be determined at trial;

d.      that Plaintiff be awarded attorney's fees and litigation expenses of filing and prosecuting this lawsuit; and

e.      that Plaintiff be awarded such other and further relief as this Court deems necessary and proper.

DATED:      Honolulu, Hawaii, March 6, 2008.

_____
VENETIA K. CARPENTER-ASUI
Attorney for Plaintiff
REZA LESANE

16